**SO ORDERED.**

**SIGNED this 12th day of August, 2025.**



*Dale L. Somers*
Dale L. Somers
United States Chief Bankruptcy Judge

_____

Designated for print publication

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **In re:** | |
| **James J. Frank,** | **Case No. 24-20779** |
| **Debtor.** | **Chapter 11** |

## Memorandum Opinion and Order Denying Confirmation of Chapter 11 Plan

In this individual Chapter 11 case, Debtor James Frank proposes to pay his creditors from the income he will receive from his electric vehicle charging station businesses. His proposed monthly payments increase each year as he predicts increased income from the businesses. The Court must decide whether his proposed payments provide a realistic and workable framework for reorganization. Because his projected income is not firmly rooted in either past

performance or predictions based on objective fact, his plan is infeasible and its confirmation must be denied.

I. Procedural Posture and Arguments

Debtor, by and through his counsel Colin N. Gotham, filed a voluntary petition under Chapter 11 of the Bankruptcy Code on June 21, 2024 and elected to proceed under Subchapter V.[1] On February 12, 2025, Debtor filed his *Second Amended Chapter 11 Small Business Plan of Reorganization.*[2] Creditor Kenneth Bruce Shaevel[3] and the United States Trustee objected to confirmation of the Plan.[4] Creditor Shaevel voted to reject the Plan.[5] On April 22, 2025, the Court held an evidentiary hearing to consider the limited issue of whether the Plan meets the Bankruptcy Code's feasibility requirements for confirmation. Creditor Shaevel appeared by counsel Neil Sader, the UST appeared by counsel Richard Kear, and the Debtor appeared by counsel, Colin Gotham.

Debtor argues that his plan is feasible because it is offered in good faith from a debtor with demonstrated work history who has a willingness to make

---

[1] All statutory references are to Title 11 of the United States Code (the "Bankruptcy Code") unless otherwise indicated.
2 Doc. 92, (the "Plan")
3 Creditors "KBLED, Inc., Kenneth Bruce Shaevel et al." filed Proof of Claim 9-1. For purposes of this opinion "Shaevel" refers to all creditors referenced in Claim 9-1.
4 Docs. 99 and 101, respectively.
5 Doc. 110

2

the proposed plan payments. Creditor Shaevel argues that the plan is not based on the reality of Debtor's business, which is not profitable and survives on the capital infusions of Debtor's business partner, Bill O'Connor. The United States Trustee argues that the Debtor's business cannot consistently pay his salary, cannot survive without capital infusion, and does not provide realistic projections for future performance or growth.

II. Facts:[6]

To rule on confirmation of the Plan, the Court finds:

Debtor is a lifelong construction manager. He testified that he started and ran several businesses upgrading electrical systems for efficiency through 2005, merged them to create a half-billion-dollar business, then left that business in 2015 to build a cell-tower installation and upgrade company. Five years ago, he got into the business of managing a group of companies that build and operate electric vehicle charging stations in Kansas and Colorado.[7] Debtor

---

[6] The Court takes judicial notice of its docket in this case. See *Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010) ("We take judicial notice of court records in the underlying proceedings."); *United States v. Ahidley,* 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) ("[W]e may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand."). Some factual findings may be included in other sections of this opinion.

[7] The primary companies are EV Build Charging Holdings, LLC; EV Charging Holdings COLO, LLC; HiON EV, LLC; EV Build, LLC; and HION Distribution, LLC. Debtor refers to the businesses as the "HiON Group." They are referred to herein as the "Businesses."

3

is a 50% owner of the Businesses. The salary he draws from the Businesses is Debtor's primary source of income.[8]

Debtor filed this case primarily to manage a pre-petition judgment entered against him and in favor of Creditor Shaevel in a California employment contract lawsuit.[9] The filed proofs of claim show primarily general unsecured debts, the largest of which is to Schaevel, claimed at $376,968.48.

Debtor's Plan proposes to pay monthly payments to general unsecured creditors totaling $94,000 over five years. Plan payments begin at $500 per month, and increase each May to $1,100 in 2026, $1,600 in 2027, $2,100 in 2028, and $2,600 in 2029 until the end of the Plan.

Based on projections attached to the Plan,[10] Debtor intends to receive monthly salary from the Businesses beginning at $5,000 in 2025, then $5,500 in 2026, $6,050 in 2027, $6,655 in 2028, $7,320.50 in 2029, and $7,320.50 in the first four months of 2030. Total income projected includes Debtor's non-filing spouse's monthly income beginning at $2,938.82 and going up to $3,572.16 by the end of the Plan.

---

8 Debtor's non-filing spouse is a part-time nurse who makes approximately $19,000 gross income per year.
9 No evidence of the name or case number of the lawsuit was admitted at trial.
10 Attached to the Plan as "Exhibit D"

Debtor has filed monthly operating reports that show actual cash received by this Debtor in these amounts:[11]

| | |
|---|---:|
| 2024 – July | $877.15 |
| 2024 – August | $5,250.05 |
| 2024 – September | $224.14 |
| 2024 – October | $5,000.08 |
| 2024 – November | $0.06 |
| 2024 – December | $4,000.06 |
| 2025 – January | $5,800.07 |
| 2025 – February | $5,000.16 |
| 2025 – March | $5,000.19 |
| 2025 – April | $5,500.22 |
| 2025 – May | $11,000.28 |

The operating reports show salary received and do not provide detailed financial information for the Businesses themselves. As evidence of the Businesses' financial condition, the Court admitted two Profitability Reports ending December 31, 2024.[12] Debtor prepared the reports and believes they reflect the Businesses performance. The reports show negative net income for 2024 for four of the six businesses listed therein. Cash infused into EV Charging Holdings, LLC, HiOn EV, LLC, and EV Build, LLC includes primarily loan proceeds, with loans listed primarily as owed to Bill O'Connor, the holder of the remaining 50% interest in the Businesses. Debtor testified

---

[11] The Court notes that the operating reports do not include the non-filing spouse's income. No evidence was presented to the Court that the non-filing spouse's income has been received as projected nor that it will increase as projected other than Debtor's assertions.

12 Debtor's Exhibits 27 and 28. Doc. Nos. 113 and 114

that no financial statements have been created. There is no other evidence before the Court about the financial details of the Businesses. Debtor testified that O'Connor manages the books for the Businesses, does the taxes, and he "would know" the details of their financial condition. Unfortunately, O'Connor did not appear or testify.

Debtor testified that it is impossible to know the value of the Businesses because the revenue is low due to the nascent nature of the electric vehicle charging technology. He believes the Businesses are in the "ramp-up" stage of development and expects higher revenue in the future. He expects the use of electrical vehicle charging to increase to full utilization of the market in three years. He believes the Businesses will break even at that time. He considers any increase in revenue to be speculative because the industry is so new, and any increase like this would probably go to creating new stations rather than management of existing stations.

Debtor testified that the Businesses are surviving on operating loans received from O'Connor and that he expects O'Connor to continue to provide funds. The Businesses owe O'Connor about half a million dollars and are not currently paying O'Connor back for the loans. They do not expect to pay on the loans until the Businesses become profitable or are sold, in which case O'Connor will be paid in full from the proceeds. There are no promissory notes,

security agreements, or any documents concerning the loans or repayment terms of O'Connor.

Debtor believes in the technology and the future of the Businesses. He believes, based on his experience in construction management, that the Businesses will become profitable, and he can sell them when they do. If they are not profitable or he cannot draw the proposed salary, he believes he can pay the required plan payments either by working as an employee for another business or by using the exempt equity in his house.

Debtor is the day-to-day manager of the Businesses. He considers them a family business – they employ his two adult sons who have experience in the industry and who draw salaries of $60,000 and $120,000 per year, respectively. To determine what Debtor receives in salary each month, he and O'Connor discuss each month what the Businesses can afford and pay him accordingly. The Businesses and Debtor do not have a formal agreement to pay Debtor a set salary each month.

III. <u>Legal Standard - Feasibility</u>

Section 1191 governs confirmation of a Subchapter V plan. The requirements for confirmation under that section depend on whether a plan is consensual or not. If no class of claims or interests votes to reject the plan, it is considered consensual and § 1191(a) applies. If a class of claims or interest

7

votes to reject the proposed plan, the plan is nonconsensual and § 1191(b) applies.

Plan confirmation is required under § 1191(b) if: (1) the requirements of § 1129(a) are met except those under paragraphs (8), (10), and (15); (2) the plan "does not discriminate unfairly, and is fair and equitable with respect to" the rejecting class of claims or interest; and (3) is fair and equitable with respect to each class of claims or interests as defined in § 1191(c).[13] By agreement of the parties, the Court's analysis of confirmation herein is limited to feasibility under § 1191(b).[14]

Among the requirements for confirmation under § 1129(a), is the "feasibility test" of § 1129(a)(11) which requires that:

> confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[15]

Debtor must prove by a preponderance of the evidence that the Plan is feasible under this standard[16] which ensures that a plan offers a reasonable

---

[13] 11 U.S.C. § 1191. Confirmation of plan. See also, *Busch Law Firm, LLC v. Frontline Medical Services LLC (In re Frontline Medical Services LLC),* 665 B.R. 818 (10th Cir BAP 2024).
[14] By agreement of the parties, the Court limits its opinion herein strictly to feasibility of the plan under § 1191(b) as set forth herein and makes no determination on confirmation of the plan on any other basis.
[15] 11 U.S.C. § 1129(a)(11)
[16] *In re Paige,* 685 F.3d 1160, 1177 (10th Cir. 2012), quoting *Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd, II),* 994 F.2d 1160,

assurance of success.[17] The Court must review the evidence and determine whether the plan "offers a reasonable prospect of success and is workable."[18]

Although not strictly required,[19] courts have determined whether a plan is feasible under § 1129(a)(11) by evaluating various factors to determine whether plans are "firmly rooted in predictions based on objective fact,"[20] including debtor's cash flow projections showing evidence of financial progress.

> A glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the plan is not feasible. On the other hand, when a court finds that the financial projections presented to support the plan are derived from "realistic and reasonable assumptions which are capable of being met[, t]he fact that unexpected events may defeat those projections does not make a plan unfeasible as a matter of law or fact.[21]

When a Subchapter V plan is nonconsensual, "the bankruptcy court must [also] find that the plan passes the feasibility test of § 1191(c)(3)"[22] which "fortifies the more relaxed feasibility test that § 1129(a)(11) contains."[23] Where

---

1165 (5th Cir. 1993) ("The proponent of a plan must demonstrate compliance by a preponderance of the evidence.")
[17] *FB Acquisition Property I, LLC v. Gentry et al. (In re Gentry)*, 807 F.3d 1222, 1225 (10th Cir. 2015) ("[A] feasible plan is not a guarantee of success but rather offers a reasonable assurance of success.")
[18] *Id.* at 1226 ("From its review of the evidence, the court need only determine whether the plan 'offers a reasonable prospect of success and is workable.'"), quoting *In re Inv. Co. of The Sw., Inc.,* 341 B.R. 298, 311 (10th Cir. BAP 2006).
[19] *Id.* at 1226.
[20] *Inv. Co. of The Sw., Inc.*, 341 B.R. at 311, quoting *In re Danny Thomas Props. II Ltd. P'ship,* 241 F.3d 959, 964 (8th Cir. 2001).
[21] *Inv. Co. of The Sw., Inc.*, 341 B.R. at 311 (citations omitted).
[22] *Frontline,* 665 B.R. at 830.
[23] *In re Samurai Martial Sports, Inc.,* 644 B.R. 667, 698 (Bankr. S.D.TX 2022)

9

§ 1129(a)(11) requires only that confirmation is not likely to be followed by liquidation or the need for further reorganization unless the plan proposes it, § 1191(c)(3) requires that the debtor can realistically carry out its plan.[24] Debtors must show either that they are able to make all payments under the plan or that there is a reasonable likelihood that they will make the payments and there are adequate remedies in the plan if they do not.[25] "Though a guarantee of success is not required, the court should be satisfied that the reorganized debtor can stand on its own two feet."[26]

IV. Analysis and Conclusions of Law

Schaevel voted to reject the Plan so the Plan is nonconsensual, and the Court must examine feasibility under § 1191(b).

A. Feasibility under § 1129(a)(11)

Under § 1191(b), the Court must first examine whether the plan is feasible under § 1129(a)(11). No liquidation or further reorganization of the

---

[24] *Pearl Resources* LLC et al., 622 B.R. 236, 269 (Bankr. S.D.TX 2020)
25 Id. at 269. See 11 U.S.C. § 1191(c)(3):
(A) the debtor will be able to make all payments under the plan; or
(B)( ) there is a reasonable likelihood that the debtor will be able to make all payments under the plan; and
(ii) the plan provides appropriate remedies, which may include the liquidation of nonexempt assets to protect the holders of claims or interests in the event that the payments are not made.
26 *Pearl Resources,* 622 B.R. at 269

Debtor is proposed in the Plan, so the Court must examine whether the Plan offers a reasonable prospect of success and is workable.[27]

The Court concludes it does not. While the Court finds the Debtor credible regarding his beliefs about the future of the Businesses, "sheer optimism and hopefulness, without more, is not sufficient to support a finding of feasibility."[28] Debtor testified that his salary would increase as the Businesses become profitable and that profitability depends on increased utilization of electric vehicle charging. While Debtor believes that market utilization of electric vehicle charging will increase to full utilization over the next three years, he did not provide any evidence of indicators or market projections for this increase other than his belief that the electric vehicle market would continue to grow — despite his admission that the "election changed things" and he did not know what government incentives may be available in the future to encourage electric vehicle growth.

While the Court believes Debtor's hopes for the future to be sincere, "feasibility determinations must be 'firmly rooted in predictions based on objective fact.'" Here, Debtor's projections for income are based on a salary that

---

[27] *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.),* 779 F.2d 1456, 1460 (10th Cir. 1985) (cleaned up).

[28] *In re Curiel,* 651 B.R. 548, 565 (9th Cir. BAP 2023), citing In re Om Shivai, Inc., 447 B.R. 459, 463 and In re Walker, 165 B.R. 994, 1004 (E.D. Va. 1994) ("sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises." (cleaned up)).

11

Debtor only receives if he and his business partner believe the Businesses can afford it. Even so, the initial salary amount of $5,000 was not based on what the Businesses could afford but "what I need to live." Debtor's ability to draw the required salary from the Businesses in the months since filing this case has varied widely according to the monthly operating reports with none or very little salary drawn several months.

And there are inadequate assurances that the Businesses will be able to maintain the salary necessary to fund the Plan. Debtor offered no predictions or projections for the income and expenses for the Businesses, only those for his personal income and expenses. Although the Court understands that the Businesses are not the Debtor here, the Debtor's salary so wholly depends on the Businesses performance and the willingness of O'Connor to fund it, that the Court cannot determine whether Debtor's projected salary or its increases are based on objective fact without detailed projections of the Businesses' profitability.

The only evidence of the Businesses' profitability is two bare-bones Profitability Reports which show that the Businesses are *not* profitable, and instead survive on capital infusion. The Businesses are only operating because O'Connor provides working capital in the form of loans that the Businesses must ultimately repay. The Businesses' ability to pay Debtor's salary is based on what the Businesses can afford and, according to available evidence, the

12

Businesses cannot afford the salary without O'Connor's good will. The Court has no evidence of O'Connor's intent to continue loaning the Businesses money other than Debtor's trust in him that he will continue to do so. Because O'Connor did not testify, the Court cannot determine whether he credibly intends to continue funding the Businesses or even his intent to do so.

The plan simply does not "provide a realistic and workable framework for reorganization" and cannot be confirmed as feasible under § 1129(a)(11).

B. <u>Feasibility Under § 1191(c)(3)</u>

Because it finds that the Plan is not feasible under § 1129(a)(11), the Court need not examine the additional feasibility test of § 1191(c)(3). However, the Court notes that even if it were presented with more robust projections for the Businesses' increased profitability based on objective facts concerning increasing electric charging utilization, for example, the Plan cannot not meet the fortified feasibility test of § 1191(c)(3) until it can "stand on its own two feet." The Plan will remain infeasible under § 1191(c)(3) until and unless the Businesses can survive without O'Connor's help. The Businesses are not profitable, and Debtor has not shown that they have or can become so. The Businesses, and so the Debtor, cannot stand on their own two feet. And so, the Plan is infeasible under § 1191(c)(3) as well.

13

V.  Conclusion and Order

To pass the Bankruptcy Code's feasibility tests, Debtor has the burden to show that his Plan provides a realistic and workable framework for success under § 1129(a)(11) and that the Plan can be realistically carried out under § 1191(c)(3). The Debtor has not presented sufficient evidence showing that the Plan is feasible.

WHEREFORE, THE COURT ORDERS that for the reasons set forth herein, confirmation of the Plan is hereby denied.

###